Gants, Ralph D., J.
On December 10, 2001, the plaintiff Richard Medina (“Medina”) stepped out of his parked vehicle on Washington Street in Newton and was struck by a car driven by Robert Riskind (“Riskind”), sustaining severe injuries. Medina initially brought this negligence action only against Francine Pillemer (“Pillemer”), as the Executor of Riskind’s Estate, since Riskind had died following the accident (but not as a result of the accident) before suit had been filed on January 23,2004. In March 2005, having learned that Riskind had experienced a seizure in September 2000 while rowing on the Charles River and that, at the time of the accident, he had been suffering from a malignant brain tumor, Medina first moved to add Dr. Fred Hochberg, Riskind’s treating neurologist, as a defendant. In his proposed Amended Complaint, Medina alleged that Dr. Hochberg:
negligently and carelessly treated his patient Robert Riskind, and negligently and carelessly failed to control his patient, by failing to order, advise, caution, warn, and instruct his patient Robert Riskind, to not operate a motor vehicle due to the foreseeable risk of injury to innocent bystanders, such as the plaintiff, who may be on the public way in the vicinity where the patient Robert Riskind was operating his motor vehicle.
Amended Complaint at 5-6.
Judge Ray Brassard on March 25, 2005 declined to act on the motion to amend and add a parly defendant “because the preferable practice is to give notice to a proposed new party.” Order, March 25, 2005. Consequently, Medina gave notice to Dr. Hochberg, and re-filed his motion to amend and add a party defendant with a certification stating that no opposition had been received within the time period set forth in Superior Court Rule 9A. On April 25, 2005, this Court allowed the motion “without opposition.”
Dr. Hochberg now moves for reconsideration of the allowance of the motion. He contends that, when he received the motion that had been mailed to him at Massachusetts General Hospital (“MGH”), he forwarded it, in accordance with MGH protocols, to the Risk Management Department at MGH, which then forwarded it to his insurance carrier. By the time the insurance carrier had designated an attorney to represent Dr. Hochberg in this action and forwarded the motion to him, the ten-day period for opposing the motion had passed. In view of these circumstances, this Court will reconsider the allowance of this motion and consider the matters at issue in this motion de novo, as if the motion had initially been brought and timely opposed by Dr. Hochberg. Having carefully reconsidered these matters, after hearing, this Court still ALLOWS Medina’s motion to amend his complaint to add Dr. Hochberg as a party defendant.
DISCUSSION
Dr. Hochberg presents three arguments in support of his contention that he should not be added as a party defendant. As will be shown, the first two are easily rejected; the third raises a serious question that appears to be one of first impression in Massachusetts law.
1. Statute of Limitations
First, Dr. Hochberg contends that the claim against him was not timely filed, since the motion to amend to add the claim against him was not filed until March 2005, more than three years after the December 10, 2001 accident that caused injury to Medina. This contention fails on two grounds.
First, under G.L.c. 260, §4, which governs medical malpractice actions, as well as under G.L.c. 260, §2A, which governs tort actions to recover for personal injuries, a tort action against a physician must be commenced within three years “after the cause of action accrues.” In 1980, in Franklin v. Albert, the Supreme Judicial Court for the first time declared that a cause of action for medical malpractice did not accrue until the “patient learns, or reasonably should have learned, that he has been harmed as a result of a defendant’s conduct.” 381 Mass. 611, 612 (1980). In McGuinness v. Cotter, the Supreme Judicial Court clarified that a malpractice cause of action accrues when the plaintiff: “(1) knew or had sufficient notice that she was harmed; and (2) knew or had sufficient notice of the cause of the harm.” 412 Mass. 617, 627 (1992). Notice is sufficient to start the limitations clock when the plaintiff possessed sufficient information or was aware of such suspicious circumstances that she recognized (or a reasonably prudent person in the plaintiffs position should have recognized) that the medical treatment provided by the defendant may have caused her harm. See McGuinness v. Cotter, 412 Mass. at 627 (cause of action accrues when plaintiff had “knowledge or sufficient notice that the obstetrical care she received from the defendants may have caused [plaintiffs] disabilities”); Bowen v. Eli Lilly & Co., 408 Mass. 204, 207 (1990) (must be “significant notice of causation” such that “a reasonable person in the position of the plaintiff would have been on notice that her mother’s ingestion of DEIS may have caused the plaintiffs cancer”); Fidler v. Eastman Kodak Co., 714 F.2d 192, 199 (1st Cir. 1983) (“notice of likely cause is ordinarily enough to start the statute running”); Malapanis v. Shirazi, 21 Mass.App.Ct. 378, 383 (1986) (“the three-year limitations period commences to run when a reasonably prudent person (in the tort claimant’s position), reacting to any suspicious circumstances of which he might have been aware (what the Court of Appeals in Fidler called ‘likely cause’), should have discovered that he had been harmed by his physician’s treatment”).
*354 This Court condudes that, in any personal injuiy tort action, regardless of whether it alleges the negligence of a physician or any other person, a cause of action does not accrue until the plaintiff (1) knows or should know that he was harmed, and (2) possesses sufficient information or becomes aware of such suspicious circumstances that he recognizes or should recognize that the defendant’s conduct may have caused the harm. Here, there is no dispute that Medina knew that he was harmed on the day he was struck by Riskind’s car. There is, however, a dispute as to when Medina should have recognized that Dr. Hochberg’s treatment of Riskind may have been a cause of the accident.
Identifying the amount of information needed in order for Medina to have recognized Dr. Hochberg’s possible responsibiliiy for the accident is no simple task. Certainly, the information need not be so great that it demonstrates negligence. McGuinness v. Cotter, 412 Mass. at 627; Bowen v. Eli Lilly & Co., 408 Mass. at 208. Nor need it demonstrate the full extent of the causal connection. White v. Peabody Construction Co., Inc., 386 Mass. 121, 130 (1982) (“The ‘notice’ required is not notice of every fact which must eventually be proved in support of the claim”); Malapanis v. Shirazi, 21 Mass.App.Ct. at 386. The information must, however, be significant enough to alert a person of ordinary prudence in the plaintiffs position of the reasonable likelihood that the injury was caused or substantially worsened by another’s conduct. See Bowen v. Eli Lilly & Co., 408 Mass. at 207 (statute of limitations starts to run when “an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury”); Hendrickson v. Sears, 365 Mass. 83, 89 (1974) (“cause of action accrues on the happening of an event likely to put the plaintiff on notice”).
Here, Dr. Hochberg notes that, in the police report regarding the accident, the police officer wrote that Riskind was “incoherent,” and then had a “seizure” when placed into the rescue vehicle. The police officer wrote that Riskind told him he was being treated at Tufts Medical Center “for a medical condition,” and the officer later learned at the Newton Wellesley Hospital emergency ward that Riskind was being treated for a brain tumor. In the Motor Vehicle Crash Operator Report, dated December 14, 2001, signed by Riskind but prepared by Pillemer (then, his wife and now, the executrix of his estate), the Crash Narrative disclosed that Riskind’s “seizures have been well-controlled with medication” and that, prior to the accident, “he had only one major seizure on September 10, 2000.”
Medina notes that he did not learn until September 22, 2004, when he received answers to Pillemer’s interrogatories, that Riskind was being treated by Dr. Hochberg from September 2000 through the date of the accident, and that Riskind had been diagnosed in September 2000 with a brain tumor, more specifically, “anaplastic astrocytoma Grade III/IV.” Medina also maintains that he did not know until he received the interrogatory answers that Pillemer was contending that Riskind had suffered a seizure while driving, as opposed to after the accident. Once he learned of Dr. Hochberg’s treatment of Riskind for his brain tumor, he then obtained a Court Order for Dr. Hochberg’s records, which he then sent to a neurology expert, who opined that Dr. Hochberg’s treatment of Riskind fell below the standard of care expected of the average neurologist because he had failed to advise Riskind not to drive.
“[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact.” Riley v. Presnell, 409 Mass. 239, 240 (1991); Castillo v. Massachusetts General Hospital Chelsea Memorial Health Care Center, 38 Mass.App.Ct. 513, 515 (1996). Under the circumstances present in this case, the question of when Medina knew or should have known that he had a cause of action against Dr. Hochberg is not one that should be decided by a court as a matter of law, especially in considering a motion to add a party defendant.
Second, even if Medina knew or should have known that he had a cause of action against Dr. Hochberg shortly after the accident and more than three years before he sought to amend his complaint, his claim against Dr. Hochberg would still not be time-barred under the “relation back” doctrine embodied in Mass.R.Civ.P. 15(c), which treats the amended complaint as if it had been brought at the time of the original complaint, which here was filed less than three years after the accident. Rule 15(c) provides:
Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment (including an amendment changing a party) relates back to the original pleading.
Mass.R.Civ.P. 15(c) (emphasis added). While the relation back doctrine may not permit an amended claim that would otherwise be barred by the statute of repose, it certainly would permit an amended claim against a new party that would otherwise be barred by the statute of limitation. See Tindol v. Boston Housing Authority, 396 Mass. 515, 519 (1986), citing James Ferrera & Sons v. Samuels, 21 Mass.App.Ct. 170, 173 (1985).
Consequently, the addition of this claim against Dr. Hochberg is not barred by the statute of limitations.
2. Unfair Prejudice
Dr. Hochberg also contends that he will be unfairly prejudiced if Medina is permitted to add him as a defendant roughly four years after the events in question. To be sure, among the reasons that a court, in its discretion, may deny a motion for leave to amend a complaint is “undue prejudice ... by virtue of allowance of the amendment.” Mathis v. Massachusetts Elec. Co., 409 Mass. 256, 264 (1991), quoting Castellucci v. United States Fidelity & Guar. Co., 372 *355 Mass. 288, 290 (1977). Dr. Hochberg, however, has failed to show why or how he has been prejudiced by the delay in bringing the claim against him. Nor, frankly, given the nature of the claim, is there any strong reason why he would suffer prejudice. As a result, this Court will not bar this claim against Dr. Hochberg because of an amorphous risk of prejudice.
3. Special Duty
The third, and most significant, argument raised by Dr. Hochberg is that amending the complaint to add a negligence claim against him would be futile, because he owed a legal duty to his patient, Riskind, but not to Medina. In considering whether a motion to amend a complaint to add a claim should be denied because the claim would be futile, this Court shall evaluate the claim using the motion to dismiss standard — that is, the Court will determine whether the claim, if added, would then be promptly dismissed for failure to state a claim. When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the Court must accept as true the factual allegations of the complaint and all reasonable inferences favorable to the plaintiff which can be drawn from those allegations. Fairneny v. Savogran, 422 Mass. 469, 470 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991).The issue is whetherthe facts alleged, generously construed in favor of the plaintiff, state a valid legal claim that would warrant relief on any theory of law. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979), citing James Ferrera & Sons v. Samuels, 21 Mass.App.Ct. 170, 173 (1985).
A physician plainly owes a legal duty to his patient to provide medical treatment that meets the standard of care of the average qualified physician in his area of specially. Consequently, if Riskind had been injured in the motor vehicle accident, and the executrix of his estate had brought a claim for negligence against Dr. Hochberg based on the allegation that the neurologist had breached the standard of care by failing to advise him not to drive because of the risk of seizures related to his brain tumor, there would be no question that the executrix had stated avalid claim against Dr. Hochberg. Here, however, the allegation is brought by Medina — the pedestrian injured when Riskind allegedly suffered a seizure while driving — who was never a patient of Dr. Hochberg and who Dr. Hochberg presumably had never met. The issue, then, is whether Dr. Hochberg, in advising Riskind as to what he may or may not do in view of his medical condition, owed a duly of care to those persons whom Riskind may foreseeably injure if he were to drive and suffer a seizure.
Massachusetts law recognizes that, in certain situations, a “special relationship” exists that imposes a duty to take affirmative acts to protect against dangerous or unlawful acts of third persons. See generally Irwin v. Town of Ware, 392 Mass. 745, 756-63 (1984); Luoni v. Berube, 431 Mass. 729, 731-32 (2000). Massachusetts law, however, is silent as to whether a physician has a special relationship, either with his patient or with the foreseeable class of victims, that imposes a duty upon the physician to advise a patient who is subject to seizures not to drive a motor vehicle. Nor is there any clear general rule or principle that establishes when the law recognizes a special relationship and when it does not. “The concept of ‘duly,’ ” according to an authoritative treatise on tort law, “is not sacrosanct in itself, but is only an expression of the sum total of... considerations of policy which lead the law to say that the plaintiff is entitled to protection ... No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.” Luoni, 431 Mass. at 735, quoting W.L. Prosser & W.P. Keeton, Torts §53, at 358-359 (5th ed. 1984). A more precisely stated principle declared by the Supreme Judicial Court is far more helpful:
While several different categories of such special relationships are recognized in the common law, they are based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.
Irwin, 392 Mass. at 756.
There are four categories of cases in which Massachusetts common law has found a special relationship that triggers a duty to protect a potential victim from harm committed by a third person. First, when an individual commits an affirmative act that creates or increases the risk that the third person will harm a potential class of victims, the individual owes a duty to the potential victim class to act reasonably in performing that affirmative act. Consequently, when a tavern owner serves alcohol to a customer, the tavern owner owes the potential class of victims a duty to stop serving that customer when he reasonably should know the customer is intoxicated. See generally Adamian v. Three Sons, Inc., 353 Mass. 498 (1968). When a social host provides alcohol to guests at his home, he, too, owes a duty to the potential class of victims to stop serving his guest when he reasonably should know that the guest has become intoxicated. See generally McGuiggan v. New England Tel. & Tel Co., 398 Mass. 152, 162 (1986) (“We would recognize a social host’s liability to a person injured by an intoxicated guest’s negligent operation of a motor vehicle where a social host who knew or should have known that his guest was drunk, nevertheless gave him or permitted him to take an alcoholic drink and thereafter, because of his intoxication, the guest negligently operated a motor vehicle causing the third person’s injury”). Similarly, while this Court has found no Massachusetts case that specifically so holds, this Court has little doubt that the Supreme Judicial Court, when faced with the question, will follow the *356 prevailing case law in other jurisdictions that holds that, when a physician prescribes to a patient a medication with side effects that pose a significant risk that the patient will fall asleep while driving or be less able to exercise effective judgment, the physician owes a duty to the potential class of victims on the road to warn the patient not to drive when taking the medication. See, e.g., Cram v. Howell, 680 N.E.2d 1096, 1098 (Ind. 1997) (physician who gave vaccination that caused patient to become unconscious “owed a duly of care to take reasonable precautions in monitoring, releasing, and warning his patient for the protection of unknown third persons potentially jeopardized by the patient’s driving upon leaving the physician’s office”); Joy v. E. Me. Med Ctr., 529 A.2d 1364 (Me. 1987) (emergency room physician who placed eye patch on patient could be found to owe a duly to driving public to warn patient of the patch’s effect on the patient’s ability to drive safely). Cf. Cottam v. CVS Pharmacy, 436 Mass. 316, 322 (2002) (doctor owes a duty to warn patient of possible side effects of prescription drugs).
Second, when there is a special relationship between the defendant and an identifiable limited class of persons that includes the plaintiff, the defendant may owe a duty to the plaintiff to protect him from the dangerous or unlawful acts of a third person. Luoni 431 Mass. at 731. See Restatement (Second) of Torts, §315(b) (duty to control the conduct of a third person to prevent physical harm to another when a “special relation exists between the actor and the other which gives to the other a right to protection”). Consequently, a college owes a duty to its students to take reasonable steps to protect them from harm from foreseeable criminal acts. See Mullins v. Pine Manor College, 389 Mass. 47 (1983). A hotel owner owes a duty to its guests to provide them with reasonable security to protect them from the foreseeable acts of criminals. See Fund v. Hotel Lenox of Boston, Inc., 418 Mass. 191 (1994). A landlord owes his tenants a similar obligation to provide security reasonably designed to prevent foreseeable criminal acts against them. See generally Poskus v. Lombardo's of Randolph 423 Mass. 637, 639 (1996) (a landlord or property owner may be liable for failing to prevent reasonably foreseeable criminal acts); Young v. Garwacki 380 Mass. 162, 170 (1980) (landlords have a responsibility to protect persons on their property from reasonably foreseeable risks of harm). This type of special relationship, “when derived from common law, is predicated on a plaintiffs reasonable expectations and reliance that a defendant will anticipate harmful acts of third persons and take appropriate measures to protect the plaintiff from harm.” Luoni 431 Mass. at 732.
Third, when there is a special relationship between the defendant and the third person who commits the harmful conduct, the defendant may have a duty to a foreseeable class of victims to control the third person’s conduct or to provide reasonable warning of the third person’s conduct. See Carr v. Howard 5 Mass. L. Rptr. 63, 1996 Mass. Super. LEXIS 602 (Norfolk Super.Ct. 1996) (Cowin, J.); Restatement (Second) of Torts, §315(a) (duty to control the conduct of a third person to prevent physical harm to another when a “special relation exists between the actor and the third person”). See also Restatement (Second) of Torts, §319 (“One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm”). Consequently, a psychiatrist and a psychiatric hospital that have custody over patients who are dangerous to themselves and others owe a common-law duty to “members of the public to take reasonable precautions to control their patients” when they transport them outside the ward. Carr at 1996 Mass.Super. LEXIS 602 at *15.[1] Similarly, but more limited in the scope of third persons to whom a duty is owed, a licensed mental health professional owes a statutory duty under Massachusetts law to take “reasonable precautions to warn or in any other way protect... a reasonably identified victim or victims” when (1) his patient has communicated to him “an explicit threat to kill or inflict serious bodily injury” upon that person or persons, or (2) when he “has a reasonable basis to believe that there is a clear and present danger that [a patient with a history of physical violence] will attempt to kill or inflict serious bodily upon that person or persons.” G.L.c. 123, §36B.
Fourth, in certain circumstances, public employees have a special relationship with the general public and therefore owe a duty to them when the foreseeable threat posed by inaction is potentially “calamitous,” and statutes or ordinances reflect a legislative intent to protect the general public from the threat. See Irwin, 392 Mass. at 756, 762. Consequently, a police officer owes a duty to the general public to take reasonable care to remove an intoxicated motorist from the road. Id at 762. Similarly, a parole officer owes a duty to the general public to take reasonable care to ensure that the parolee he is supervising on his release from a murder conviction had not been released erroneously. See Jean W. v. Commonwealth, 414 Mass. 496 (1993). Along comparable lines, a parole officer owes a duty to the general public to act reasonably when he recommends that a parolee rapist obtain employment as a maintenance man at a trailer park (where he would obtain the keys to each trailer) and when he describes to the prospective employee the parolee’s prior criminal history. See Bonnie W. v. Commonwealth, 419 Mass. 122 (1994).
The instant case does not fit neatly into any of these categories, but it also includes elements of each. As to the first category, Dr. Hochberg is not alleged to have provided Riskind with any prescription or any medical procedure that itself increased the likelihood of a seizure while driving, but he did engage in the affirmative act of treating Riskind as his neurology patient. Dr. Hochberg’s treatment of Riskind itself arguably increased the likelihood of a seizure while driving, because Riskind failed to obtain the advice of another treating neurologist, who, if *357 acting in accordance with the standard of care, would have told him to stop driving because of his medical condition. Moreover, while affirmative action may impose a duty upon someone to act reasonably who otherwise had no such duty, Dr. Hochberg’s duty to Riskind existed from the moment he agreed to treat him. Therefore, while a friend of Riskind who might have failed to advise him to stop driving owed neither Riskind nor the driving public any legal duty to proffer that advice, Dr. Hochberg, by his treatment of Riskind, certainly owed Riskind the legal duty to offer that advice. In contrast with a Good Samaritan, whose duly to act reasonably arises solely from his stopping to help, Dr. Hochberg already had a duty of care to Riskind and could not avoid that duty by failing to offer advice — a doctor’s error of omission may be as or more serious than his error of commission.
As to the second category, Dr. Hochberg’s primary obligation was certainly to Riskind, as his patient, rather than to any third party, but it is noteworthy here that the advice Medina contends he was owed — Dr. Hochberg’s warning his patient not to drive — is consistent with the advice that a reasonable doctor owes his patient, and not in conflict with it. The risk to the driving public, therefore, is the same as the risk to Riskind himself — -both could be severely injured or killed in a motor vehicle accident if Riskind were to suffer a seizure while driving.
As to the third category, Dr. Hochberg, as Riskind’s neurologist, certainly had a special relationship with Riskind. While Riskind’s brain tumor and the consequent risk of seizures may not have made him as likely to commit bodily harm as a homicidal or suicidal mental patient, there allegedly was a significant risk that he would cause grievous bodily harm if he were to be behind the wheel and suffer another seizure. Like the psychiatrist treating a homicidal or suicidal mental patient, Dr. Hochberg was in the best position to have known of the potentially dangerous condition and to have taken reasonable steps to avert that risk. However, unlike with a psychiatrist (except when the issue, as in Carr, is the secure transport of a patient within the hospital grounds), the reasonable steps Medina alleges should have been taken here do not involve the revelation of Riskind’s medical condition to any third party, just the giving of advice by a doctor to his patient. Medina does not contend that Dr. Hochberg had a duty to alert the police or the Registry of Motor Vehicles to Riskind’s seizure condition; he simply alleges that Dr. Hochberg should have advised Riskind to stop driving because of his brain tumor and the resulting risk of seizures. Consequently, in contrast with a psychiatrist whose special duty at times may require him to reveal otherwise privileged psychotherapist-patient communications, the special duty alleged here would require a doctor only to provide the patient with the advice that the patient himself is due.
As to the fourth category, while Dr. Hochberg is certainly not a public employee, it is noteworthy that the Massachusetts regulations of the Registry of Motor Vehicles, whose declared purpose “is to promote the safety of the public and that of the licensee by providing minimum physical and mental qualification standards determined to be necessary for the safe operation of a motor vehicle,” 540 CMR §24.01, requires a driver who has experienced a seizure immediately to surrender his driver’s license until the licencee has been “episode free for a minimum of six months.” 540 CMR §24.05(1).[2] The regulations do not permit the routine return of the driver’s license in such situations until the licensee:
submits an evaluation completed by his or her physician confirming that he or she has been free from episodes for a minimum of six months, and which states all of the following:
(a) the cause of the episode (type of disorder suffered); and
(b) the means by which the condition is controlled (including any medications and dosages); and
(c) the degree of impairment or disability suffered during the episode (extent of episode); and
(d) the probability of recurrence of the episode (including frequency of occurrence, degree of assurance that the event will not reoccur, and basis for estimate of probability); and
(e) date of most recent episode; and
(f) a certification, to a reasonable degree of medical certainty, that the individual’s medical condition and medications will not interfere with the safe operation of a motor vehicle.
540 CMR §24.05(1). The regulations also permit the Registrar to grant an exemption from this six-month waiting period “upon receipt of a certification from the physician containing all of the information specified in 540 CMR 24.05(1) and requesting that the individual be granted an exemption from the six-month episode-free policy because the physician has determined that the individual’s medical condition and medications will not interfere with the safe operation of a motor vehicle, with specific reasons provided for such determination.” 540 CMR §24.05(2). The regulations impose no obligation on the licensee’s physician to notify the Registry of a seizure episode, but the regulations reflect the Registry’s determination that a person who suffers a seizure is presumptively unfit to drive without, at least, a written medical certification declaring that the seizure condition is under control and, “to a reasonable degree of medical certainty,” not likely to interfere with the licensee’s safe operation of his motor vehicle. The duty that Medina seeks to impose upon Dr. Hochberg is entirely consistent with the public policy reflected by this regulatory provision. Indeed, as a result of this regulation, if Riskind had reported his seizure to the Registry of Motor Vehicles, as he was required to do, he would not have been permitted again to drive without a medical opinion from his physician.
*358 In determining whether Dr. Hochberg had a special relationship with the class of persons who may foreseeably be victimized by a patient driving a car despite a history of seizures (which this Court will refer to as the “potential victim class”), this Court has also considered certain circumstances in which the Supreme Judicial Court has declined to find a legal duly. While social hosts have a duty to control the alcohol they serve to guests, they do not otherwise owe a duly to control the dangerous behavior of their guests, either on or off their properly, whether that dangerous behavior be drinking alcohol brought by guests to the party, setting off fireworks, or engaging in horseplay around the swimming pool. See generally Luoni, 431 Mass. at 734-35. In reaching this result, the Supreme Judicial Court was motivated, at least in part, by the recognition that social hosts often do not have “the means” to prevent their guests from engaging in dangerous conduct. See id. at 734. Certainly, one can understand the reluctance to impose a duty on a social host that may trigger a confrontation between a social host and an unruly guest who refuses to leave or to stop his potentially dangerous conduct. See Ulwick v. DeChristopher, 411 Mass. 401, 406 (1991) (“Hosts in these circumstances might be left with little alternative than to resort to physical force in order to discourage further drinking or to try to eject the guest, a solution that in many cases will aggravate the situation and put the drunk driver where he should not be — behind the wheel of a car”). The Supreme Judicial Court was also motivated, at least in part, byareluctance to burden social hosts who invite guests to their homes, believing that the risk of liability should not be the natural consequence of hospitality. See McGuiggan v. New England Tel & Tel Co., 398 Mass. at 160 (“The reluctance of courts to impose liability in these circumstances has been founded, rightly or wrongly, on policy considerations, particularly consideration of the effect that a rule of social host liability would have on a multitude of personal relationships in a variety of social settings"). In contrast, a physician has the “means” to advise his patient as to what he should and should not do as a result of his medical condition. As long as the common law does not require the physician to report the seizure to the Registry of Motor Vehicles or otherwise disclose privileged doctor-patient communications, there is little risk that the imposition of a duty will create a conflict between the doctor and the patient, discourage patients from disclosing sensitive medical information to their doctors, or otherwise materially burden the doctor-patient relationship.
The Supreme Judicial Court has also refused to impose a duty to third parties upon those with a fiduciary duty to specific persons where it would result in conflicting duties. For instance, an attorney has no duty to take reasonable care to protect the interests of non-clients “where an attorney is also under an independent and potentially conflicting duty to a client.” Spinner v. Nutt, 417 Mass. 549, 553 (1994), quoting Page v. Frazier, 388 Mass. 55, 63 (1983), and Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 524, cert. denied, 493 U.S. 894 (1989). In the instant case, however, there is no material risk of a conflict between the doctor’s duty to his patient and any duty he may owe to the potential victim class, because the risk each faces is the same — if Riskind were to suffer a seizure while driving, Riskind and any other motorist or pedestrian in his path would all be in mortal danger. Indeed, here, if Dr. Hochberg did not breach the duty of care he owed to Riskind, as his patient, by offering negligent advice (or failing to offer any advice) about driving, then Dr. Hochberg cannot have breached the duty he owed to the potential victim class.
In light of this analysis, this Court concludes that Dr. Hochberg had a special relationship with the potential victim class arising from:
his doctor-patient relationship with Riskind;
the identity of interests of the patient and the potential victim class, and the absence of any need for the doctor, in complying with this special duty, to disclose information to anyone outside the doctor-patient relationship that would violate doctor-patient confidentiality;
the regulatory requirement that the patient surrender his license upon suffering a seizure and not gain reinstatement without a written certification from his physician stating, “to a reasonable degree of medical certainty, that the individual’s medical condition and medications will not interfere with the safe operation of a motor vehicle,” 540 CMR §24.05;
the severity of the danger to the potential victim class if the doctor fails reasonably to advise his patient not to drive after a seizure; and
the absence of any meaningful distinction between an affirmative act and an omission in the context of advice offered within a doctor-patient relationship.
If a doctor’s duty to the potential victim class in such circumstances were to become established under the common law by the Supreme Judicial Court, Massachusetts would join, at least, California, Michigan, and Delaware in finding that a doctor owes a duty to the traveling public to act with reasonable care when a patient’s medical condition or medication makes it dangerous for the patient to drive. See Myers v. Queensberry, 144 Cal.App.3d 888 (Cal.App.4th Dist. 1983) (doctor owed duty to foreseeable victims among traveling public to warn patient not to drive because of her irrational and uncontrolled diabetic condition); Duvall v. Goldin, 139 Mich.App. 342 (1984), appeal denied, 422 Mich. 976 (1985) (doctor owed duty to traveling public to use reasonable care in treating patient with epileptic seizures); Harden v. Allstate Ins. Co., 883 F.Sup. 963 (D.Del. 1995) (same).[3]
In finding such a duty under these limited circumstances, Massachusetts would also part ways with, at least, Missouri, Texas, Iowa, Kansas, and Florida, which have refused to imposed such a duty on physicians in favor of the traveling public. See Young v. Wadsworth, *359 916 S.W.2d 877 (Mo.App.Ct. 1996) (doctor owes no duty to others on the road who were killed and injured by patient who lost consciousness while driving to use reasonable care in treating patient who suffers episodic blackouts); Praesel v. Johnson, 967 S.W.2d 391 (Tex. 1998) (doctor owes no duty of reasonable care in treating epileptic patient to driver of vehicle killed in crash with patient when he suffered a grand mal seizure); Schmidt v. Mahoney, 659 N.W.2d 552 (Iowa2003) (doctor owes no duty to traveling public to warn patient with seizure .disorder not to drive); Calwell v. Hassan, 260 Kan. 769 (1996) (doctor with patient suffering from sleep disorder owes no duty of reasonable care to victim injured in head-on collision with patient after patient fell asleep at the wheel); Werner v. Varner Stafford & Seaman, P.A., 659 So.2d 1308, 1310-11 (Fla.Dist.Ct.App. 1995) (doctor owes no duty of care to victim injured in automobile accident with epileptic patient because doctor’s duty is limited to patient and “known and identifiable third parties”).
To test the wisdom of imposing such a duty under Massachusetts law, it is worthwhile to examine the rationales used by at least some of these courts in finding no duty. The Missouri Court of Appeals did “not consider it necessary to address the somewhat fluid area of the law involving the duty of a professional to persons other than clients or patients for negligence in failing to preclude injury to those parties." Young, 916 S.W.2d at 878. Rather, it found that the failure of the doctor to warn a patient suffering from syncope[4] could not be the proximate cause of the accident victims’ death and serious injury because the patient was aware that he suffered blackouts, it is common knowledge that a person suffering from sudden unexpected blackouts should not drive a motor vehicle, and “[t]here is no duty or need to warn of dangers which are open and obvious or which are commonly known.” Id. at 878-79.[5] It would be plainly inappropriate for a Massachusetts court to dismiss a case based on a finding that the plaintiff could not prove causation, especially when, as here, the plaintiff has obtained the opinion of a medical expert that Dr. Hochberg was negligent in failing to warn Riskind not to drive and the plaintiff alleges that the doctor’s negligence was a proximate cause of the plaintiffs injury. See Gibbs Ford, Inc. v. United Truck Leasing Corporation, 399 Mass. 8, 13 (1987) (“Doubt as to whether a particular claim is provable is not a proper basis to dismiss a plaintiffs complaint under rule 12(b)(6)”).
The Texas Supreme Court questioned the efficacy of a doctor’s warning in persuading a patient who already knows of his medical condition not to drive. Praesel 967 S.W.2d at 398. The Court concluded:
Balancing both the need for and the effectiveness of a warning to a patient who already knows that he or she suffers from seizures against the burden of liability to third parties, we conclude that the benefit of warning an epileptic not to drive is incremental but that the consequences of imposing a duly are great. The responsibility for safe operation of a motor vehicle should remain primarily with the driver who is capable of ascertaining whether it is lawful to continue to drive once a disorder such as epilepsy has been diagnosed and seizures have occurred. Accordingly, we decline to impose on physicians a duty to third parties to warn an epileptic patient not to drive.

Id.

In deciding whether this holding should be followed by Massachusetts courts, it is worth examining the benefit/burden analysis that led to the Texas Court’s decision not to impose a duty to warn. As to the purported meager benefits, another justice who concurred in the Praesel decision observed that there was no support in the record for . the Court’s assumption that the risk of a seizure while driving and the potential consequences of such a seizure “should be obvious to those who suffer from epilepsy.” Id. at 399 (Enoch, J., concurrence). There was also no support in the record for the Court’s apparent conclusion that a doctor’s advice not to drive would often be ineffective in persuading the patient not to drive.
As to the purported burdens of imposing such liability, the opinion is silent as to why the Court concluded that the “consequences of imposing a duty are great.” See id. at 398. The Court earlier noted that, in deciding whether to impose a common-law duty, the Court considered the following factors:
“social, economic, and political questions and their application to the facts at hand”;
“the risk, foreseeability, and likelihood of injury";
“the social utility of the actor’s conduct”;
“the magnitude of the burden of guarding against the injuiy”;
“the consequences of placing the burden on the defendant”; and
“whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.”
Id. at 397-98, citing Graff v. Beard, 858 S.W.2d 918, 920 (Tex. 1993). Having earlier identified these factors, the Court failed to discuss any but the last in the context of a case raising the issue of whether a doctor treating an epileptic patient had a duty to use reasonable care in warning him not to drive. Certainly, the State of Texas recognized the “risk, foreseeability, and likelihood of injury” from an epileptic continuing to drive because the Court noted that “(tjhose with neurological disorders such as epilepsy have an obligation under the statutes and regulations of [Texas] to contact the Department of Public Safely so that the Department may determine if driving is permitted.” Id. at 398. The Court did not explain why there is any “social utility” in a doctor not reasonably advising his patient about the wisdom of driving or why *360 there would be any “burden” in requiring that reasonable care be taken in giving this advice. By a process of elimination, one must conclude that the “great” consequences feared by the imposition of such a duty were “social, economic, and political,” which the Texas Court never chose to articulate, but which this Court opines probably concerns the reluctance to expand the scope of liability faced by medical malpractice insurers. Given the limited duty at issue here, and the relative ease by which doctors may comply with that duty, even that unstated risk does not appear to be “great.”
The Iowa Supreme Court focused on two related considerations in reaching its decision that a physician owed no duty of reasonable care to the potential victims of a patient suffering from seizure disorders. First, the Court feared that doctors would become overly restrictive in advising patients with seizure conditions whether they should drive. The Court observed:
. . . [I]t is highly likely that a consequence of recognizing liability to members of the general public on the facts of this case will be that physicians treating patients with seizure disorders will become reluctant to allow them to drive or engage in any other activity in which a seizure could possibly harm a third party. In order to curtail liability, physicians may become prone to make overly restrictive recommendations concerning the activities of their patients and will exercise their role as reporters to the department of transportation in an inflexible manner not in their patient’s best interest.
Schmidt, 659 N.W.2d at 555. At the time of this decision, Iowa Code §321.186 provided, “A physician . . . may report to the department [of transportation] the identity of a person who has been diagnosed as having a physical or mental condition which would render the person physically or mentally incompetent to operate a motor vehicle in a safe manner.” As previously discussed, there is no statutory or regulatory provision allowing a doctor to report the condition of his patient to the Registry of Motor Vehicles under Massachusetts law. Yet, once the Registry learns that the patient had a recent seizure episode, the Registry will suspend the patient’s license and will not vacate the suspension without a written medical certification from the licensee’s physician. frr short, in Massachusetts, a patient who has suffered a seizure cannot drive until his doctor declares that he is fit to drive. If the doctor declares him fit and the doctor is wrong, he can anticipate a malpractice claim brought by the patient; it is doubtful that the possibility of a lawsuit brought by those his patients have injured while driving will materially affect his opinion.
The Iowa Court also considered Iowa Code §321.186, which provides, “A physician . . . has no duty to make a report or to warn third parties with regard to any knowledge concerning a person’s mental or physical competency to operate a motor vehicle in a safe manner . . .” Schmidt, 659 N.W.2d at 555. The Iowa Supreme Court declared:
Although the language of the statute does not embrace claims based on advice that doctors give their patients, we believe that the same policies that justify immunity from suit with respect to licensing recommendations to government officials preclude us from recognizing liability to members of the general public based on advice that is communicated to a patient by a physician.
Id. at 556. No Massachusetts statute provides comparable immunity from suit to physicians in these circumstances.
In short, the review of these contrary decisions from other states demonstrates that, while the refusal to impose a duty to the potential victim class in those decisions may have been appropriate in light of those states’ statutory and regulatory provisions and their common-law traditions, the imposition of a duty on a physician to the potential victim class to exercise reasonable care in advising a patient with a seizure condition as to whether he should drive is in keeping with Massachusetts’ regulatory provisions and our common-law tradition.
ORDER
For the reasons stated above, this Court hereby ORDERS, upon reconsideration, that the plaintiffs Motion to Amend the Complaint and Add Dr. Fred Hochberg as a Party Defendant is ALLOWED.

 In Carr, a psychiatrist and the psychiatric ward of the hospital negligently failed to take special precautions to transport a suicidal patient, and the patient escaped from his staff escort and jumped to his death, landing on and injuring a landscaper standing below. The injured landscaper sued the psychiatrist and the hospital for negligence. Superior Court Judge Judith Cowin (now, Justice Cowin of the Supreme Judicial Court) denied the defendants’ motion for summary judgment, finding that the psychiatrist and the hospital owed a duty of care to the class of foreseeable victims, including the injured landscaper. Carr at 1996 Mass. Super. LEXIS 602.

 While the word “seizure” is not defined in the regulations, the word “episode” is: “A seizure, syncope, or any other form of altered consciousness which will or may affect the safe operation of a motor vehicle.” 540 CMR 24.02.

 The Delaware case, in fairness, is distinguishable because Section 1763, Title 24 of the Delaware Code requires every physician treating epilepsy to report to the Division of Motor Vehicles the names and addresses of the patients he is treating for that condition. The doctor failed to report his patient because he was “philosophically opposed” to the statute, believing that it “constituted a betrayal of his patients’ right to privacy, and of the doctor/patient privilege.” Harden, 883 F.Sup. at 967. Massachusetts, of course, imposes no such statutory obligation upon doctors. Nor would the common-law legal duty claimed in this case impose any such reporting obligation.

 Syncope is defined as “[a] swoon or fainting, a sudden fall of blood pressure or failure of the cardiac systole, resulting in cerebral anemia and more or less complete loss of consciousness.” Id. at 878 n.1, quoting Stedman’s Medical Dictionary, 20th Edition.

 The Kansas Supreme Court relied on a similar argument, finding that the patient with a sleep disorder knew of the risk of sleeping while driving, and “there is not a duty to warn someone of what they already knew.” Calwell 260 Kan. at 784.